1

2

3

4

5

6

7

8                               UNITED STATES DISTRICT COURT

9                         FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   ANTHONY ARCEO,                              No.  2:11-cv-2396 KJN P

12              Plaintiff,

13        v.                                     ORDER

14   SOCORRO SALINAS, et al.,

15              Defendants.

16

17        Plaintiff is a civil detainee presently housed at Coalinga State Hospital, proceeding pro se

18   with a civil rights action pursuant to 42 U.S.C. § 1983.  Plaintiff filed a second amended

19   complaint on December 8, 2014, alleging that defendants retaliated against plaintiff based on the

20   exercise of his free speech rights by, *inter alia*, denying grievances as well as denying his mother

21   visitation, and also appears to challenge the constitutionality of the jail's administrative grievance

22   procedure.

23        However, on January 6, 2015, and January 21, 2015, plaintiff's mother, Sylvia Arceo,

24   filed amended complaints signed solely by Sylvia Arceo, alleging that San Joaquin Jail staff

25   denied her visitation with her son, Anthony Arceo.  Sylvia Arceo is not a plaintiff in this action,

26   and was not granted permission to file amended complaints herein.  Moreover, in plaintiff's

27   second amended complaint, plaintiff alleges that defendants retaliated against plaintiff in various

28   ways, including the alleged deprivation of visitation with his mother.  Although Sylvia Arceo

                                               1

1   claims her son is helping her file her amended complaints, it is unclear whether plaintiff intended

2   for his mother to pursue her claims in this action, or her own action.  In any event, this action may

3   proceed only on one operative complaint.  Thus, Ms. Arceo's third and fourth amended

4   complaints are stricken from the record, and the court now screens plaintiff's second amended

5   complaint.

6          1.  Grievance Process

7          First, prisoners have no stand-alone due process rights related to the administrative

8   grievance process.  See Mann v. Adams, 855 F.2d 639, 640 (9th Cir. 1988); see also Ramirez v.

9   Galaza, 334 F.3d 850, 860 (9th Cir. 2003) (holding that there is no liberty interest entitling

10  inmates to a specific grievance process), cert. denied, 541 U.S. 1063 (2004).  Put another way,

11  prison officials are not required under federal law to process inmate grievances in a specific way

12  or to respond to them in a favorable manner.  Because there is no right to any particular grievance

13  process, plaintiff cannot state a cognizable civil rights claim for a violation of his due process

14  rights based on allegations that prison officials ignored or failed to properly process grievances.

15  See, e.g., Wright v. Shannon, 2010 WL 445203 at *5 (E.D. Cal. Feb. 2, 2010) (plaintiff's

16  allegations that prison officials denied or ignored his inmate appeals failed to state a cognizable

17  claim under the First Amendment); Walker v. Vazquez, 2009 WL 5088788 at *6-7 (E.D. Cal.

18  Dec.17, 2009) (plaintiff's allegations that prison officials failed to timely process his inmate

19  appeals failed to a state cognizable under the Fourteenth Amendment); Towner v. Knowles, 2009

20  WL 4281999 at *2 (E.D. Cal. Nov. 20, 2009) (plaintiff's allegations that prison officials screened

21  out his inmate appeals without any basis failed to indicate a deprivation of federal rights);

22  Williams v. Cate, 2009 WL 3789597 at *6 (E.D. Cal. Nov. 10, 2009) ("Plaintiff has no protected

23  liberty interest in the vindication of his administrative claims.").  Because plaintiff has no

24  constitutional right to a particular grievance process, his attempt to challenge the constitutionality

25  of such process fails to state a cognizable claim.

26          2.  Alleged Denial of Visitation

27          Second, the alleged temporary denial of visitation claim is unavailing as to plaintiff or his

28  mother.

2

"[F]reedom of association is among the rights least compatible with incarceration."

Overton v. Bazzetta, 539 U.S. 126, 131 (2003).  Some curtailment must be expected in the prison

context.  Id.; Gerber v. Hickman, 291 F.3d 617, 621 (9th Cir. 2002) (loss of intimate association

part and parcel with confinement).  Spouses and family members of prisoners do not have rights

or privileges to visitation distinct from those of the inmate to which they are married or related.

Hill v. Washington State Dep't of Corrections, 628 F.Supp.2d 1250, 1263 (W.D. Wash. 2009);

Harris v. Murray, 761 F.Supp. 409, 412 (E.D. Va.1990).  "Such incarcerated persons . . . maintain

no right to simple physical association -- with their parents or with anyone else -- grounded in the

first amendment.  Thorne v. Jones, 765 F.2d 1270, 1273-75 (5th Cir. 1985) (holding prisoner had

no absolute right to visits from his parents).

Prison regulations that curtail the right to freedom of association by restricting family

visiting privileges are not necessarily unconstitutional.  Dunn v. Castro, 621 F.3d 1196, 1201 (9th

Cir. 2010) (right to freedom of association is limited in prison, thus, imposition of prison

regulation preventing inmate from visitation with his children permissible); Overton, 539 U.S. at

129-32 (despite how severely the prison regulations at issue restricted the prisoners' right to

receive visits from family, they were still constitutional); Block v. Rutherford, 468 U.S. 576, 586,

589 (1984) ("[T]he Constitution does not require that pretrial detainees be allowed contact visits

when responsible, experienced administrators have determined, in their sound discretion, that

such visits will jeopardize the security of the facility."); Gerber, 291 F.3d at 621(right of intimate

association is necessarily abridged in the prison setting); Samford v. Dretke, 562 F.3d 674, 682

(5th Cir. 2009) (per curiam) (holding the removal of prisoner's sons from the approved visitors

list did not violate his constitutional rights).

A court need not determine the extent to which freedom of association survives

incarceration if the regulation at issue bears a rational relationship to legitimate penological

interests.  See Overton, 539 U.S. at 132.  Great deference must be shown to prison administrators

"in the adoption and execution of policies and practices that in their judgment are needed to

preserve internal order and discipline and to maintain institutional security."  Hill, 628 F.Supp.2d

at 1263; Bell v. Wolfish, 441 U.S. 520, 547 (1979).  The courts must not become unnecessarily

1    involved in prison administration.  Id.; see also Procunier v. Martinez, 416 U.S. 396, 405 (1974),

2    overruled in part on other grounds, Thornburgh v. Abbott, 490 U.S. 401, 413-14 (1989).  Prison

3    officials must have the ability to anticipate security problems and address such problems as

4    needed.  Martinez, 416 U.S. at 405.  Prison security decisions are "peculiarly within the province

5    and professional expertise of corrections officials, and, in the absence of substantial evidence in

6    the record to indicate that prison officials have exaggerated their response to these considerations,

7    courts should ordinarily defer to their expert judgment in such matters."  Pell v. Procunier, 417

8    U.S. 817, 827 (1974).

9         The Due Process Clause protects prisoners from the deprivation of life, liberty or property

10   without due process of law.  Thompson, 490 U.S. at 460.  But individuals claiming a protected

11   interest must have a legitimate claim to it, either from the Due Process clause itself, or through

12   state laws.  Thompson, 490 U.S. at 460.  However, the "denial of prison access to a particular

13   visitor 'is well within the terms of confinement ordinarily contemplated by a prison sentence,'

14   and therefore is not independently protected by the Due Process Clause."  Thompson, 490 U.S. at

15   460, quoting Hewitt v. Helms, 459 U.S. 460, 468 (1983).[1]  Moreover, federal and state laws have

16   not created a protected interest in visitation.  See Barnett v. Centoni, 31 F.3d 813, 817 (9th Cir.

17   1994) (per curiam) (holding that prisoners have no constitutional right to contact visitation);

18   Thompson, 490 U.S. at 461; Egberto v. McDaniel, 2011 WL 1233358, *9 (D. Nev. Mar. 28,

19   2011) ("law is clear that inmates do not have a right to visitation under the Due Process Clause of

20   the Fourteenth Amendment") (citing Thompson, 490 U.S. at 461.)

21        Moreover, in Dunn, the Ninth Circuit found that defendants were entitled to qualified

22   immunity where the prisoner was temporarily subjected to an 18 month suspension of visitation

23   privileges with his three minor children.  Id., 621 F.3d at 1204.  The Ninth Circuit found that the

24   right of a prisoner to receive visits from his children was not clearly established:

25                  In Block v. Rutherford, the Court held "that the Constitution does
                    not require that detainees be allowed contact visits when
26                  responsible, experienced administrators have determined, in their

27   _____

28   [1]  Hewitt was overruled, in part, on other grounds by Sandin v. Conner, 515 U.S. 472, 483-84
     (1995).

                                             4

1
2
3
4
5

sound discretion, that such visits will jeopardize the security of the facility." 468 U.S. 576, 589, 104 S. Ct. 3227, 82 L.Ed.2d 438 (1984).   [Footnote omitted.]   In Kentucky Department of Corrections v. Thompson, the Supreme Court held "[t]he denial of prison access to a particular visitor is well within the terms of confinement ordinarily contemplated by a prison sentence, and therefore is not independently protected by the Due Process Clause." 490 U.S. 454, 461, 109 S. Ct. 1904, 104 L.Ed.2d 506 (1989) (internal citation and quotation marks omitted).

6
7
8
9
10
11
12
13
14
15
16
17

In Overton v. Bazzetta, the Court considered a substantive due process claim challenging various prison regulations restricting prisoners' rights to receive visits from family members. 539 U.S. 126, 129-30, 123 S. Ct. 2162, 156 L.Ed.2d 162 (2003). The Court's own hesitation in articulating the existence and nature of an inmate's right to receive visits from family members while in prison is instructive.   The Court acknowledged that "*outside the prison context*, there is some discussion in our cases of a right to maintain certain familial relationships, including association among members of an immediate family and association between grandchildren and grandparents." Id. at 131, 123 S. Ct. 2162 (emphasis added). The Court, however, declined to "attempt to explore or define the asserted right of association at any length or determine the extent to which it survives incarceration." Id. at 132, 123 S. Ct. 2162.  At the same time, the Court observed that "[a]n inmate does not retain rights inconsistent with proper incarceration," and that "freedom of association is among the rights *least compatible* with incarceration." Id. at 131, 123 S. Ct. 2162 (emphasis added).   Further, despite how "severe[ly]" the prison regulations at issue in Overton restricted the prisoners' right to receive visits from their own family, including minors, id. at 134, 123 S. Ct. 2162, the Court upheld the constitutionality of the challenged regulations, id. at 136-37, 123 S. Ct. 2162.

18   Dunn, 621 F.3d at 1201-02.

19   Taking the above cases into account, the court notes that the plaintiff here is not a

20   prisoner, but is a civil detainee, who is similar in some ways to convicted "prisoners," i.e.,

21   persons serving criminal sentences, but different in other ways.  Thus, the undersigned cautiously

22   draws upon authority from related contexts to address the temporary denial of visitation at issue.

23   For example, civil detainees enjoy constitutional protection under the Fourteenth Amendment's

24   Due Process Clause -- not the Eighth Amendment, which analogously protects prisoners -- from

25   state facilities' imposition of restrictions and other general conditions of confinement that do not

26   reasonably serve a legitimate, non-punitive government objective.  Cf. Bell, 441 U.S. at 538-39

27   (discussing rights of pretrial criminal detainees).  The same Due Process Clause also bars

28   particular acts or omissions by facility staff that are done with deliberate indifference or cruelty.

5

1  See Hare v. City of Corinth, 74 F.3d 633, 645-48 (5th Cir. 1996) (distinguishing Bell in such

2  situations based on DeShaney v. Winnebago County Dept. of Social Services, 489 U.S. 189, 198-

3  200 (1989) (indicating that, whether source of detained person's right is Fourteenth Amendment

4  or Eighth Amendment, the rationale for applying a governmental duty to aid confined persons

5  was the same for both criminals and civil detainees)).

6       Civil detainees like plaintiff enjoy the same or greater First and Fourteenth Amendment

7  rights as those enjoyed by prisoners.  See, e.g., Jones v. Blanas, 393 F.3d 918, 931 (9th Cir. 2004)

8  (the "more protective" Fourteenth Amendment substantive due process standard protects

9  detainees, not the Eighth Amendment standard applicable to prisoners).  Prisoners and civil

10  detainees do not leave all of their constitutional rights at the prison or jail gates.  See Bell, 441

11  U.S. at 545.  Nevertheless, institutional authorities may restrict the constitutional freedoms that

12  institutionalized persons would otherwise enjoy, so long as those restrictions are rationally related

13  to a legitimate and neutral governmental objective.  See Turner v. Safley, 482 U.S. 78, 87 (1987);

14  Bell, 441 U.S. at 460-61.

15       Courts use a four-part test to determine whether a prison regulatory policy is "reasonably

16  related to legitimate penological interests."  Turner, 482 at 89.  The first factor is whether there is

17  a "valid, rational connection" between the regulation and a legitimate government interest.  Id.

18  The second is whether the inmate has an alternative means of exercising the allegedly impinged

19  constitutional right.  Id. at 90.  Third, the court considers the cost to accommodate the asserted

20  right on guards, deputies, and other prison or jail resources.  Id.  Finally, the court considers

21  whether there are ready alternatives to the challenged regulation.  Id.  The "absence of ready

22  alternatives is evidence of the reasonableness of a prison regulation."  Id.

23       In addition, the Supreme Court, citing Turner and Bell, has upheld a greater restriction --

24  barring even through-the-glass contact visits to inmates by their minor nieces and nephews -- than

25  that imposed on plaintiff and his mother.  Overton, 539 U.S. at 126.  In 1995, the Michigan

26  Department of Corrections (MDOC) enacted new restrictions on visits to state prisoners.  Inmates

27  deemed to be the highest security risks could not receive any personal-contact visits.  Such

28  inmates had to "communicate with their visitors through a glass panel, [with] the inmate and the

6

visitor being on opposite sides of a booth." Overton, 539 U.S. at 130.  Further, MDOC did not

allow even non-contact visits by minors unless the minors were the children, grandchildren or

siblings of the high-security inmates.  Michelle Bazzeta and other MDOC inmates brought a civil

rights action, relying on the First and Fourteenth Amendments, challenging the latter restrictions,

but not the more general rule barring all personal-contact visits.  Id.  The Supreme Court, relying

on Bell and Turner, rejected their claims:

> Turning to the restrictions on visitation by children, we conclude
> that the regulations bear a rational relation to MDOC's valid
> interests in maintaining internal security and protecting child
> visitors from exposure to sexual or other misconduct or from
> accidental injury. The regulations promote internal security,
> perhaps the most important of penological goals, *see, e.g.,* Pell,
> *supra*, at 823, 94 S. Ct. 2800, by reducing the total number of
> visitors and by limiting the disruption caused by children in
> particular.  Protecting children from harm is also a legitimate goal,
> *see, e.g.,* Block, *supra*, at 586-587.

Overton, 539 U.S. at 133.

Although Overton involved a prison, and not a jail, the interest in maintaining internal

security is the same.  In addition, the Block case involved pretrial detainees, but the Court found

that in this context pretrial detainees should be treated similarly to convicted inmates.  Block, 468

U.S. at 587.  Thus, while plaintiff is to be afforded more considerate treatment than a prisoner,

Youngberg v. Romeo, 457 U.S. 307, 322 (1982), the Constitution does not require that detainees

be allowed contact visits, Block, 468 U.S. at 589, and the court has not found any authority

requiring that civil detainees be allowed contact visits.

Moreover, plaintiff was not deprived of all family visits, or permanently deprived of all

visits with his mother.  Rather, other family members were allowed to visit, and plaintiff was

temporarily deprived of visits with his mother for a total period of 22 days:  on March 4, 2012,

and April 3, 2012, and his mother was subject to two separate ten-day visit suspensions:  from

November 15, 2011, to November 24, 2011, and from February 12, 2012, to February 22, 2012.

(ECF No. 22 at 4.)  In Overton, the restriction on visitation was far more onerous than the

restrictions on plaintiff's mother's visits alleged here, and the 22 day time frame is far shorter

than the 18 month suspension of visitation in Dunn.

In addition, plaintiff and his mother provided a copy of the November 6, 2011 letter from Sgt. Cholula, San Joaquin County Disciplinary Sergeant, stating that plaintiff's mother's visits were suspended for ten days in 2011 because jail personnel complained that while she was in the visiting lobby, plaintiff's mother was soliciting visitors to join the mother's support group, despite prior requests that the mother stop such solicitations.  (ECF Nos. 21 at 48; 23 at 29.)  Such letter provides a rational basis in maintaining internal security for the ten day suspension of visitation in 2011, to which this court must defer.  See Pell, 417 U.S. at 827; Bell, 441 U.S. at 547.  "[T]he Constitution does not require that detainees be allowed contact visits when responsible, experienced administrators have determined, in their sound discretion, that such visits will jeopardize the security of the facility."  Block, 468 U.S. at 589.  Thus, jail officials have wide discretion to regulate visits between detainees and their family members.

Therefore, the temporary suspension of visits for a 24 day period fails to rise to the level of a constitutional violation.  But even if it did, jail employees would be entitled to qualified immunity because the right of a civil detainee to have visits with his mother is not clearly established.  See, e.g., Howard v. Hunter, 2011 WL 2711095 (C.D. Cal. June 17, 2011) (defendants entitled to qualified immunity because the right of an institutionalized sexually violent predator to visit with his daughter is not clearly established); Cerniglia v. Carona, 2010 WL 4823896, *4 (E.D. Cal. Nov. 12, 2010) (government officials entitled to qualified immunity because "[t]he right of a civil detainee to have visits with his children is not clearly established").

In light of the above, plaintiff should not renew any claim based on the alleged temporary denial of visitation in any third amended complaint.

3. No Respondeat Superior Liability

Third, plaintiff's claims based on defendants' alleged "supervisory" actions also fail because supervisory personnel are generally not liable under § 1983 for the actions of their employees under a theory of respondeat superior.  See Fayle v. Stapley, 607 F.2d 858, 862 (9th Cir. 1979) (no liability where there is no allegation of personal participation); Mosher v. Saalfeld, 589 F.2d 438, 441 (9th Cir. 1978) (no liability where there is no evidence of personal participation), cert. denied, 442 U.S. 941 (1979).  Vague and conclusory allegations concerning

8

1    the involvement of official personnel in civil rights violations are not sufficient.  See Ivey v.

2    Board of Regents, 673 F.2d 266, 268 (9th Cir. 1982) (complaint devoid of specific factual

3    allegations of personal participation is insufficient).

4            4. Alleged Retaliation

5            Finally, plaintiff included a section in his second amended complaint which is entitled

6    "Retaliation."  (ECF No. 21 at 9.)  In this section, plaintiff recounts a litany of events, many of

7    which pertain to his efforts to obtain grievance forms, or that complain about how the grievance

8    was addressed or not addressed.  As noted above, plaintiff has no due process right to a particular

9    grievance process.  Thus, plaintiff's efforts to challenge such incidents by including them in a

10   section entitled "retaliation" is insufficient to state a claim for retaliation.  As plaintiff was

11   previously informed (ECF No. 7 at 5), "[p]risoners have a First Amendment right to file

12   grievances against prison officials and to be free from retaliation for doing so."  Watison v.

13   Carter, 668 F.3d 1108, 1114 (9th Cir. 2012) (citing Brodheim v. Cry, 584 F.3d 1262, 1269 (9th

14   Cir. 2009)).  A viable retaliation claim in the prison context has five elements:  "(1) An assertion

15   that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's

16   protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment

17   rights, and (5) the action did not reasonably advance a legitimate correctional goal."  Rhodes v.

18   Robinson, 408 F.3d 559, 567-68 (9th Cir. 2005).

19           Thus, a defendant's response to a grievance, without more, is insufficient to state a claim

20   for retaliation.  Moreover, defendant Adams' act of kicking plaintiff's legal mail, while

21   unprofessional, does not rise to the level of adverse action.  Plaintiff received the legal mail and

22   was able to file a grievance concerning defendant Adams' actions.  While plaintiff's allegations

23   that he was unable to obtain a grievance form may be relevant to rebut a claim that plaintiff failed

24   to exhaust administrative remedies in connection with the underlying claim, such arguments are

25   not presently before the court, and such claims, standing alone, fail to state a cognizable

26   retaliation claim.  None of the allegations contained in plaintiff's retaliation section, as presently

27   written, state a cognizable retaliation claim.  However, plaintiff is granted leave to amend should

28   he be able to allege facts meeting the required elements of Rhodes.

5. <u>Conclusion</u>

In an abundance of caution, plaintiff's second amended complaint is dismissed, and he is granted one final opportunity to file a third amended complaint.  If plaintiff chooses to file a third amended complaint, plaintiff must demonstrate how the conditions complained of have resulted in a deprivation of plaintiff's federal constitutional or statutory rights.  <u>See</u> <u>Ellis v. Cassidy</u>, 625 F.2d 227 (9th Cir. 1980).  Also, the third amended complaint must allege in specific terms how each named defendant is involved.  There can be no liability under 42 U.S.C. § 1983 unless there is some affirmative link or connection between a defendant's actions and the claimed deprivation. <u>Rizzo v. Goode</u>, 423 U.S. 362 (1976); <u>May v. Enomoto</u>, 633 F.2d 164, 167 (9th Cir. 1980); <u>Johnson v. Duffy</u>, 588 F.2d 740, 743 (9th Cir. 1978).  Furthermore, vague and conclusory allegations of official participation in civil rights violations are not sufficient.  <u>Ivey v. Board of Regents</u>, 673 F.2d 266, 268 (9th Cir. 1982).

In addition, plaintiff is informed that the court cannot refer to a prior pleading in order to make plaintiff's third amended complaint complete.  Local Rule 220 requires that an amended complaint be complete in itself without reference to any prior pleading.  This requirement is because, as a general rule, an amended complaint supersedes the original complaint.  <u>See</u> <u>Loux v. Rhay</u>, 375 F.2d 55, 57 (9th Cir. 1967).  Once plaintiff files a third amended complaint, the original pleading no longer serves any function in the case.  Therefore, in a third amended complaint, as in an original complaint, each claim and the involvement of each defendant must be sufficiently alleged.

In accordance with the above, IT IS HEREBY ORDERED that:

1.  The third and fourth amended complaints (ECF Nos. 22 & 23) submitted by plaintiff's mother, Sylvia Arceo, are stricken;

2.  Plaintiff's second amended complaint (ECF No. 21) is dismissed;

3.  Plaintiff is granted thirty days from the date of service of this order to file a third amended complaint that complies with the requirements of the Civil Rights Act, the Federal Rules of Civil Procedure, and the Local Rules of Practice; the third amended complaint must bear the docket number assigned this case and must be labeled "Third Amended Complaint"; plaintiff

1  must file an original and two copies of the third amended complaint; failure to file a third

2  amended complaint in accordance with this order will result in a recommendation that this action

3  be dismissed; and

4       4.  The Clerk of the Court shall serve a copy of this order on Sylvia Arceo, 3309

5  Telegraph Avenue, Stockton, California  95204.

6  Dated:  March 16, 2015

7

8                                        _____
                                         KENDALL J. NEWMAN
9  /arce2396.14a                         UNITED STATES MAGISTRATE JUDGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

11